Jason M. Drangel (JD 7204)
jdrangel@ipcounselors.com
Ashly E. Sands (AS 7715)
asands@ipcounselors.com
Danielle Futterman (DY 4228)
dfutterman@ipcounselors.com
Gabriela N. Nastasi
gnastasi@ipcounselors.com
Grace A. Rawlins
grawlins@ipcounselors.com
EPSTEIN DRANGEL LLP
60 East 42nd Street, Suite 1250
New York, NY 10165
Telephone: (212) 292-5390
Facsimile: (212) 292-5391
*Attorneys for Plaintiff*
*Celine S.A., Christian Dior S.A., Fendi S.r.l., and Loewe S.A.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CELINE S.A., CHRISTIAN DIOR S.A., FENDI S.R.L., AND LOEWE S.A.,<br><br>*Plaintiffs*<br><br>v.<br><br>HONGKONG CSSBUY E-COMMERCE CO., LIMITED, d/b/a CSSBUY d/b/a CSSBUY<br><br>*Defendant* | CIVIL CASE NO.: 24-cv-4627<br><br>**AMENDED 1) TEMPORARY RESTRAINING ORDER; 2) ORDER RESTRAINING DEFENDANT'S ASSETS WITH THE FINANCIAL INSTITUTIONS; 3) ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE; 4) ORDER AUTHORIZING BIFURCATED AND ALTERNATIVE SERVICE; AND 5) ORDER AUTHORIZING EXPEDITED DISCOVERY**<br><br>**<u>FILED UNDER SEAL</u>** |

**GLOSSARY**

| Term | Definition |
|---|---|
| **Plaintiffs** | Celine S.A. ("Celine"), Christian Dior S.A. ("Dior"), Fendi S.r.l. ("Fendi"), and Loewe S.A. ("Loewe") |
| **CSSBuy or Defendant** | HongKong CSSBuy E-Commerce Co., Limited d/b/a CSSBUY d/b/a CSSBUY, which operates the online platform available at cssbuy.com that offers services to consumers across the world and specifically consumers residing in the U.S., including New York, including by assisting consumers with sourcing, consolidating, marketing, promoting, offering for sale, selling, purchasing, warehousing and shipping goods to or from third-party Chinese marketplaces |
| **Taobao** | Taobao, operating as Taobao.com, which is owned and operated by Alibaba Group Holding Limited, is an online marketplace platform that allows manufacturers, wholesalers and other third-party merchants to advertise, offer for sale, sell, distribute and ship their wholesale and retail products in China |
| **1688** | 1688, operating as 1688.com, which is also owned and operated by Alibaba Group Holding Limited, is an online marketplace platform that allows manufacturers, wholesalers and other third-party merchants to advertise offer for sale, sell, distribute and ship their wholesale and retail products in China |
| **Epstein Drangel** | Epstein Drangel LLP, counsel for Plaintiffs |
| **New York Address** | 60 East 42nd Street, Suite 1250, New York, New York 10165 |
| **Complaint** | Plaintiffs' Complaint |
| **Application** | Plaintiffs' *ex parte* application for: 1) a temporary restraining order; 2) an order restraining Defendant's Assets (as defined *infra*) with the Financial Institutions (as defined *infra*); 3) an order to show cause why a preliminary injunction should not issue; 4) an order authorizing alternative service and 5) an order authorizing expedited discovery |
| **Lambert Dec.** | Declaration of Nicolas Lambert in Support of Plaintiffs' Application |
| **Rawlins Dec.** | Declaration of Grace A. Rawlins in Support of Plaintiffs' Application |
| **Celine Products** | Celine's luxury women's and men's leather goods, clothing, perfume and other fashion accessories |
| **Celine Marks** | Celine's trademarks, covered by the following U.S. Trademark Registration Nos.: 3,919,067 for  for a variety of |

| | |
|---|---|
| | goods in Class 25; 6,337,314 for  for a variety of goods in Classes 9 and 18; 6,187,133 for  for a variety of goods in Classes 3, 4, 6, 9, 14, 18, 25 and 35; 1,000,156 **CÉLINE** for  for a variety of goods in Class 18; 4,879,264 for  for a variety of goods in Class 18; 4,741,109 for  for a variety of goods in Class 18; 5,489,333 for  for a variety of goods in Class 18; 5,929,320 for **CELINE** for a variety of goods in Class 4; 4,434,530 for **CELINE** for a variety of goods in Class 3; 1,772,927 for "CELINE" for a variety of goods in Classes 14 and 25; 982,010 for "CELINE" for a variety of goods in Classes 10, 25 and 26; and 2,475,129 for "CELINE" for a variety of goods in Class 9 |
| **Dior Products** | Dior's luxury women's and men's leather goods, clothing, perfume and other fashion accessories |
| **Dior Marks** | Dior's trademarks covered by the following U.S. Trademark Registration Nos.: 2,790,589 for  for a variety of |

2

goods in Classes 9, 14 and 25; 1,776,536 for  for a variety of goods in Classes 18 and 25; 4,389,968 for  for a variety of goods in Classes 9, 18 and 25; 1,123,944 for  for a variety of goods in Classes 9, 14, 18 and 25; 1,807,042 for  for a variety of goods in Classes 6 and 26; 4,853,081 for  for a variety of goods in Classes 9, 14, 18 and 25; 7,082,609 for  for a variety of goods in Classes 9, 14, 18 and 25; 7,082,532 for  for a variety of goods in Classes 9, 14, 18 and 25; 1,816,812 for  for a variety of goods in Class 16; 3,561,323 for  for a variety of goods in Class 9; 1,923,564 for  for a variety of goods in Classes 14 and 18; 2,932,805 for  for a variety of goods in Class 35; 2,749,176 for  for a variety of goods in Classes 18 and 25; 3,002,132 for  for a variety of goods in Class 14; 7,209,574 for "BABY DIOR" for a variety of goods in Classes 9, 12, 14, 18, 20, 21, 25 and 28; 523,754 for "CHRISTIAN DIOR" for a variety of goods in Classes 10, 25, and 26; 543,994

| | |
|---|---|
| | for "CHRISTIAN DIOR" for a variety of goods in Class 18; 6,578,531 for "DIORIVIERA" for a variety of goods in Classes 9, 14, 18 and 25; 519,367 for "CHRISTIAN DIOR" for a variety of goods in Class14; 541,088 for "CHRISTIAN DIOR" for a variety of goods in Class 25; 567,077 for "CHRISTIAN DIOR" for a variety of goods in Class 25; 954,404 for "CHRISTIAN DIOR" for a variety of goods in Class 9; 954,415for "DIOR" for a variety of goods in Class 14; 1,848,630 for "DIOR" for a variety of goods in Class 25; 5,980,125 for "DIOR SADDLE" for a variety of goods in Class 18; 4,953,491 for "DIORAMA" for a variety of goods in Class 14; and 5,505,434 for "J'ADIOR" for a variety of goods in Classes 9, 14, 18 and 25 |
| **Fendi Products** | Fendi's luxury women's and men's leather goods, clothing, perfume and other fashion accessories |
| **Fendi Marks** | Fendi's trademarks covered by the following U.S. Trademark  Registration Nos.: 5,505,551 for        for a variety of goods in Classes 3, 9, 14, 18, 20, 25 and 35; 1,569,570 for  for a variety of goods in Class 14;  4,058,337 for       for a variety of goods  in Class 9; 5,887,601 for       for a variety of goods in Classes 9, 14, 18 and 25; 2,648,257 for  for a variety of goods in Class 18;  6,874,501 for      for a variety of goods in Classes 9 and 14; |



2,648,256 for  for a variety of goods in Class 18: 5,563,158 for  for a variety of goods in Classes 3, 9, 14, 18, 20, 25 and 35: 6,861,520 for  for a variety of goods in Classes 3, 9, 14, 18, 20 and 25: 7,128,810 for  for goods in Class 18: 1,267,539 for  for a variety of goods in Classes 3 and 25: 6,821,740 for  for a variety of goods in Classes 3 and 27: 4,362,861 for  for a variety of goods in Classes 9, 14, 18, 20 ,24 and 25: 1,214,472 for  for a variety of goods in Class 18: 4,036,925 for

|  |  for a variety of goods in Classes 18 and 25;<br><br>1,583,578 for  for a variety of goods in Class 14; 2,803,999 for "BAGUETTE" for a variety of goods in Class 18; 6,866,947 for "FENDI" for a variety of goods in Classes 3, 20, and 27; 7,122,024 for "PEEKABOO" for a variety of goods in Class 18; 4,929,737 for "FENDI" for a variety of goods in Class 9; and 6,868,227 for "FENDI FIRST" for a variety of goods in Class 18 |
| **Loewe Products** | Loewe's luxury women's and men's leather goods, clothing, perfume and other fashion accessories |
| **Loewe Marks** | Loewe's trademarks covered by the following U.S. Trademark Registration Nos.: 1,328,409 for  for a variety of goods in Classes 18 and 25; 4,852,854 for  for a variety of goods in Class 25; 5,047,314 for  for a variety of goods in Classes 3, 9, 14, 18 and 25; 1,122,323 for "LOEWE" for a variety of goods in Classes 16, 18 and 20; and 2,770,759 for "LOEWE" for a variety of goods in Class 25 |
| **Counterfeit Products** | Products bearing or used in connection with the Celine Marks, Dior Marks, Fendi Marks or Loewe Marks, and/or products in packaging and/or containing labels bearing any of the Celine Marks, Dior Marks, Fendi Marks or Loewe Marks and/or products that are identical or confusingly similar to the Celine Products, Dior Products, Fendi Products or Loewe Products |
| **Infringing Listings** | Defendant's listings for Counterfeit Products |
| **Merchant Storefronts** | Any and all storefronts through which sellers on the Taobao and 1688 platforms import, export, advertise, market, promote, distribute, display, offer for sale, sell and/or otherwise deal in |

| | |
|---|---|
| | Counterfeit Products, which are promoted and/or advertised by Defendant, its respective officers, employees, agents, servants and any persons in active concert or participation with any of them |
| **Defendant's Assets** | Any and all money, securities or other property or assets of Defendant (whether said assets are located in the U.S. or abroad) |
| **Defendant's Financial Accounts** | Any and all financial accounts associated with or utilized by Defendant (whether said accounts are located in the U.S. or abroad) |
| **Financial Institutions** | PayPal Inc. ("PayPal"), the Alibaba Group d/b/a Alibaba.com payment services, World First Asia, Ltd. ("World First Asia"), AUS Merchant Services, Inc. ("AUS") and Alipay Merchant Services Pte. Ltd., Alipay.com Co., Ltd., Ant Financial Services Group, Stripe Payments Canada, Ltd. ("Stripe"), Visa Inc. ("Visa"), American Express Company ("American Express"), Mastercard Inc. ("Mastercard"), Discover Financial Services, Inc. ("Discover"), Google LLC payment services (e.g. Google Pay), Apple Inc. payment services ("Apple Pay"), JPMorgan Chase Bank, NA ("Chase"), Payoneer Inc. ("Payoneer"), PingPong Global Solutions Inc. ("PingPong"), Airwallex (Hong Kong) Limited ("Airwallex HK"), Airwallex (UK) Limited, Worldpay (HK) Limited ("Worldpay"), World First UK Ltd. ("World First UK"), Bank of China ("BOC"), Citibank N.A. ("Citibank"), Green Dot Bank, iDEAL payment services ("iDEAL"), Wise payment services ("Wise"), WeChat Pay Payment Services (e.g. WeChat Pay), Community Federal Savings Bank ("CFSB"), First Century Bank NA ("First Century") and/or any entities affiliated with those listed herein holding Defendant's Assets |

On this day, the Court considered Plaintiffs' *ex parte* application for the following: 1) a temporary restraining order; 2) an order restraining Defendant's Assets with the Financial Institutions; 3) an order to show cause why a preliminary injunction should not issue; 4) an order authorizing bifurcated and alternative service and 5) an order authorizing expedited discovery against Defendant and Financial Institutions in light of Defendant's intentional and willful advertising, listing, promoting, purchasing, validating, reviewing, warehousing, packaging and shipping of Counterfeit Products.[1] Having reviewed the Application, Declarations of Nicolas Lambert and Grace A. Rawlins, along with exhibits attached thereto and other evidence submitted in support thereof, the Court makes the following findings of fact and conclusions of law:

## PRELIMINARY FACTUAL FINDINGS & CONCLUSIONS OF LAW

1.      Celine, founded in Paris in 1945 by Céline Vipiana and her husband Richard, began as a custom children's shoe boutique. Celine has grown to become a world-renowned luxury brand engaging in the sale of the Celine Products – high-quality luxury goods, including a variety of men's and women's apparel, fashion accessories, and leather goods, which are sold throughout the United States.

2.      In 1997, LVMH Moët Hennessy Louis Vuitton, ("LVMH") acquired Celine.

3.      The Celine Products are marketed under the Celine Marks.

4.      The Celine Products are sold directly to consumers via Celine's official website, https://www.celine.com/, and distributed through its own brick and mortar stores, along with prominent third-party retailers, such as Bergdorf Goodman, Neiman Marcus, Saks Fifth Avenue and Harrods. Celine is stocked in stores worldwide, including but not limited to, those in Paris, Monte Carlo, Geneva, Tokyo, and Rome.

---

[1] Where a defined term is referenced herein and not defined herein, the defined term should be understood as it is defined in the Glossary.

5.    The Celine brand—known for combining preppy, classic elements with retro-sports influences to create laidback, nonchalant pieces—is recognized for its minimalistic aesthetic and tonal color palette.

6.    The Celine brand and Celine Products have been featured in numerous publications, including, but not limited to, *Vogue, Women's Wear Daily* and *Forbes*.

7.    The Celine Products typically retail for between $500-$10,000.

8.    While Celine has gained significant common law trademark and other rights in its Celine Marks and Celine Products through its use, advertising and promotion, Celine has also protected its valuable rights by filing for and obtaining federal trademark registrations.

9.    For example, Celine owns the following U.S. Trademark Registration Nos.:

3,919,067 for  for a variety of goods in Class 25; 6,337,314 for  for a

variety of goods in Classes 9 and 18; 6,187,133 for  for a variety of goods in Classes

3, 4, 6, 9, 14, 18, 25 and 35; 1,000,156 for **CÉLINE** for a variety of goods in Class

18; 4,879,264 for  for a variety of goods in Class 18; 4,741,109 for



for a variety of goods in Class 18; 5,489,333 for                    for a variety of goods in

Class 18; 5,929,320 for **CELINE** for a variety of goods in Class 4; 4,434,530 for

**CELINE** for a variety of goods in Class 3; 1,772,927 for "CELINE" for a variety of

goods in Classes 14 and 25; 982,010 for "CELINE" for a variety of goods in Classes 10, 25 and

26; and 2,475,129 for "CELINE" for a variety of goods in Class 9.

10.     The Celine Marks are currently in use in commerce in connection with the Celine

Products. The Celine Products were first used in commerce on or before the dates of first use

reflected in the respective registrations attached to the Complaint as Exhibit A.

11.     The success of the Celine Products is due in part to Celine's marketing and

promotional efforts. These efforts include advertising and promotion through social media,

Celine's website (*available at* https://celine.com/) and print and internet-based advertising.

12.     Celine's success is also due to its use of the highest quality materials and processes

in making the Celine Products.

13.     Additionally, Celine owes a substantial amount of the success of the Celine

Products to its consumers and word-of-mouth buzz that its consumers have generated.

14.     Celine's efforts, the quality of Celine's products and the word-of-mouth buzz

generated by its consumers have made the Celine Marks and Celine Products prominently placed

in the minds of the public. Members of the public and retailers have become familiar with the

Celine Marks and Celine Products and have come to associate them exclusively with Celine.

10

Celine has acquired a valuable reputation and goodwill among the public as a result of such associations.

15.    Celine has gone to great lengths to protect its interests in the Celine Products and the Celine Marks. No one other than Celine and its authorized licensees and distributors are authorized to manufacture, import, export, advertise, offer for sale or sell any goods utilizing the Celine Marks or otherwise use the Celine Marks, without the express permission of Celine.

16.    Dior, founded in Paris in 1947 by Christian Dior, began as a women's luxury ready-to-wear brand. Dior has grown to become a world-renowned luxury brand engaging in the sale of the Dior Products – high-quality luxury goods, including a variety of men's and women's apparel, fashion accessories, and leather goods, which are sold throughout the United States.

17.    In 2017, LVMH fully acquired Dior.

18.    The Dior Products are marketed under the Dior Marks.

19.    The Dior Products are sold directly to consumers via Dior's official website, https://www.dior.com/, and distributed through its own brick and mortar stores, along with prominent third-party retailers, such as Bergdorf Goodman, Nordstrom, Saks Fifth Avenue and Selfridges. Dior is stocked in stores worldwide, including but not limited to, those in Paris, New York, Geneva and Seoul.

20.    The Dior brand—renowned for its use of sculptural shapes, nipped-in waistlines, and full skirts, thereby creating a feminine and glamorous aesthetic that exudes elegance and grace—is recognized for its romantic, and sophisticated style. Dior's designs often feature luxurious fabrics, intricate embroidery, and meticulous tailoring.

21.    The Dior brand and Dior Products have been featured in numerous publications, including, but not limited to, *Vanity Fair, The Business of Fashion* and *Harper's Bazaar*.

11

22.    The Dior Products typically retail for between $500-$10,000.

23.    While Dior has gained significant common law trademark and other rights in its Dior Marks and Dior Products through use, advertising and promotion, Dior has also protected its valuable rights by filing for and obtaining federal trademark registrations.

24.    For example, Dior owns the following U.S. Trademark Registration Nos.: 2,790,589 for  for a variety of goods in Classes 9, 14 and 25; 1,776,536 for  for a variety of goods in Classes 18 and 25; 4,389,968 for  for a variety of goods in Classes 9, 18 and 25; 1,123,944 for  for a variety of goods in Classes 9, 14, 18 and 25; 1,807,042 for CD for a variety of goods in Classes 6 and 26; 4,853,081 for  for a variety of goods in Classes 9, 14, 18 and 25; 7,082,609 for  for a variety of goods in Classes 9, 14, 18 and 25; 7,082,532 for  for a variety of goods in Classes 9, 14, 18 and 25; 1,816,812 for Christian Dior for a variety of goods in Class 16; 3,561,323 for Dior for a variety of goods in Class 9; 1,923,564 for Dior for a variety of goods in Classes 14 and 18; 2,932,805 for Dior for a variety of goods in Class 35; 2,749,176 for

for a variety of goods in Classes 18 and 25; 3,002,132 for  for a variety of goods in Class 14; 7,209,574 for "BABY DIOR" for a variety of goods in Classes 9, 12, 14, 18, 20, 21, 25 and 28; 523,754 for "CHRISTIAN DIOR" for a variety of goods in Classes 10, 25, and 26; 543,994 for "CHRISTIAN DIOR" for a variety of goods in Class 18; 6,578,531 for "DIORIVIERA" for a variety of goods in Classes 9, 14, 18 and 25; 519,367 for "CHRISTIAN DIOR" for a variety of goods in Class14; 541,088 for "CHRISTIAN DIOR" for a variety of goods in Class 25; 567,077 for "CHRISTIAN DIOR" for a variety of goods in Class 25; 954,404 for "CHRISTIAN DIOR" for a variety of goods in Class 9; 954,415for "DIOR" for a variety of goods in Class 14; 1,848,630 for "DIOR" for a variety of goods in Class 25; 5,980,125 for "DIOR SADDLE" for a variety of goods in Class 18; 4,953,491 for "DIORAMA" for a variety of goods in Class 14; and 5,505,434 for "J'ADIOR" for a variety of goods in Classes 9, 14, 18 and 25.

25.    The Dior Marks are currently in use in commerce in connection with the Dior Products. The Dior Marks were first used in commerce on or before the dates of first use reflected in the respective registrations attached to the Complaint as Exhibit B.

26.    The success of the Dior Products is due in part to Dior's marketing and promotional efforts. These efforts include advertising and promotion through social media, Dior's website (*available at* https://dior.com/) and print and internet-based advertising.

27.    Dior's success is also due to its use of the highest quality materials and processes in making the Dior Products.

28.    Additionally, Dior owes a substantial amount of the success of the Dior Products to its consumers and word-of-mouth buzz that its consumers have generated.

29.    Dior's efforts, the quality of Dior's products and the word-of-mouth buzz generated

by its consumers have made the Dior Marks and Dior Products prominently placed in the minds of the public. Members of the public and retailers have become familiar with the Dior Marks and Dior Products and have come to associate them exclusively with Dior. Dior has acquired a valuable reputation and goodwill among the public as a result of such associations.

30.    Dior has gone to great lengths to protect its interests in the Dior Products and the Dior Marks. No one other than Dior and its authorized licensees and distributors are authorized to manufacture, import, export, advertise, offer for sale or sell any goods utilizing the Dior Marks or otherwise use the Dior Marks in connection, without the express permission of Dior.

31.    Fendi was founded in Rome in 1925 by Adele and Edoardo Fendi. Beginning largely as a small boutique specializing in leather goods, Fendi has grown to become a world-renowned luxury brand engaging in the sale of the Fendi Products – high-quality luxury goods, including a variety of men's and women's apparel, fashion accessories, and leather goods, which are sold throughout the United States.

32.    In 2000, Fendi was acquired by LVMH.

33.    The Fendi Products are marketed under the Fendi Marks.

34.    The Fendi Products are sold direct to consumer via Fendi's official website, https://www.fendi.com/, and distributed through its own brick and mortar stores along with prominent third-party retailers, such as Bloomingdales, Neiman Marcus, Saks Fifth Avenue and Dover Street Market. Fendi is stocked in stores worldwide, including but not limited to, those in Rome, Vienna, Madrid, Dubai and Monte Carlo.

35.    The Fendi brand—renowned for its experimentation, daring creativity, exquisite craftsmanship and sophisticated design aesthetic—is  recognized for its luxurious furs, fine leather and distinguishable handbags.

14

36.    The Fendi brand and Fendi Products have been featured in numerous publications, including, but not limited to, *Elle, InStyle* and *Harper's Bazaar*.

37.    The Fendi Products typically retail for between $500 - $10,000.

38.    While Fendi has gained significant common law trademark and other rights in its Fendi Marks and Fendi Products through its use, advertising and promotion, Fendi has also protected its valuable rights by filing for and obtaining federal trademark registrations.

39.    For example, Fendi owns the following U.S. Trademark Registration Nos.:



5,505,551 for                              for a variety of goods in Classes 3, 9, 14, 18, 20, 25 and 35;



1,569,570 for                              for a variety of goods in Class 14; 4,058,337 for



**FENDI** for a variety of goods in Class 9; 5,887,601 for                              for a



variety of goods in Classes 9, 14, 18 and 25; 2,648,257 for                              for a variety

of goods in Class 18; 6,874,501 for                              for a variety of goods in Classes 9 and 14; 2,648,256

15

for  for a variety of goods in Class 18; 5,563,158 for

 for a variety of goods in Classes 3, 9, 14, 18, 20, 25 and 35; 6,861,520

for  for a variety of goods in Classes 3, 9, 14, 18, 20 and 25; 7,128,810 for

 for goods in Class 18; 1,267,539 for  for a variety of goods in

Classes 3 and 25; 6,821,740 for  for a variety of goods in Classes 3 and 27;

4,362,861 for  for a variety of goods in Classes 9, 14, 18, 20 ,24 and 25; 1,214,472

for  for a variety of goods in Class 18; 4,036,925 for  for a variety

of goods in Classes 18 and 25; 1,583,578 for        for a variety of goods in Class 14;

2,803,999 for "BAGUETTE" for a variety of goods in Class 18; 6,866,947 for "FENDI" for a

variety of goods in Classes 3, 20, and 27; 7,122,024 for "PEEKABOO" for a variety of goods in

Class 18; 4,929,737 for "FENDI" for a variety of goods in Class 9; and 6,868,227 for "FENDI

FIRST" for a variety of goods in Class 18.

40.     The Fendi Marks are currently in use in commerce in connection with the Fendi

Products. The Fendi Products were first used in commerce on or before the dates of first use

reflected in the respective registrations attached to the Complaint as Exhibit C.

41.     The success of the Fendi Products is due in part to Fendi's marketing and

promotional efforts. These efforts include advertising and promotion through social media, Fendi's

website (*available at* https://fendi.com/) and print and internet-based advertising.

42.     Fendi's success is also due to its use of the highest quality materials and processes

in making the Fendi Products.

43.     Additionally, Fendi owes a substantial amount of the success of the Fendi Products

to its consumers and word-of-mouth buzz that its consumers have generated.

44.     Fendi's efforts, the quality of Fendi's products and the word-of-mouth buzz

generated by its consumers have made the Fendi Marks and Fendi Products prominently placed in

the minds of the public. Members of the public and retailers have become familiar with the Fendi

Marks and Fendi Products and have come to associate them exclusively with Fendi. Fendi has

acquired a valuable reputation and goodwill among the public as a result of such associations.

45.     Fendi has gone to great lengths to protect its interests in the Fendi Products and the

Fendi Marks. No one other than Fendi and its authorized licensees and distributors are authorized to manufacture, import, export, advertise, offer for sale or sell any goods utilizing the Fendi Marks or otherwise use the Fendi Marks, without the express permission of Fendi.

46.    Founded in Madrid, Spain in 1846 by a group of talented leather craftsmen, the Loewe brand, which is now world-famous, is one of the oldest luxury brands in the world. Loewe is engaged in the business of selling a diverse portfolio of Loewe Products – luxury goods, including men's and women's apparel, accessories, leather goods, perfumes and cosmetics, which are sold through various channels of trade in the United States and globally.

47.    The Loewe brand is recognized for its minimalistic aesthetic and artisanal craftsmanship.

48.    In 1996, Loewe was acquired by LVMH.

49.    The Loewe Products are marketed under the Loewe Marks.

50.    The Loewe Products are sold directly to consumers via Loewe's official website, https://loewe.com, and distributed through its own brick and mortar stores along with prominent third-party retailers, such as Bergdorf Goodman, Neiman Marcus, Saks Fifth Avenue and Selfridges. Loewe is stocked in stores worldwide, including but not limited to, those in Madrid, Tokyo, Milan, Hong Kong, Miami, and the Wynn Hotel Las Vegas.

51.    The Loewe brand and Loewe Products have been featured in numerous publications, including, but not limited to, *Who What Wear*, *Elle* and *Harper's Bazaar*.

52.    The Loewe Products typically retail for between $65.00 - $16,000.00.

53.    While Loewe has gained significant common law trademark and other rights in its Loewe Marks and Loewe Products through its use, advertising and promotion, Loewe has also protected its valuable rights by filing for and obtaining federal trademark registrations.

54.    For example, Loewe owns the following U.S. Trademark Registration Nos.:



1,328,409 for                for a variety of goods in Classes 18 and 25; 4,852,854 for

for a variety of goods in Class 25; 5,047,314 for                for a variety of goods in

Classes 3, 9, 14, 18 and 25; 1,122,323 for "LOEWE" for a variety of goods in Classes 16, 18 and

20; and 2,770,759 for "LOEWE" for a variety of goods in Class 25.

55.    The Loewe Marks are currently in use in commerce in connection with the Loewe

Products. The Loewe Marks were first used in commerce on or before the dates of first use as

reflected in the respective registrations attached to the Complaint as Exhibit D.

56.    The success of the Loewe Products is due in part to Loewe's marketing and

promotional efforts. These efforts include advertising and promotion through social media,

Loewe's website (*available* at https://loewe.com/) and print and internet-based advertising.

57.    Loewe's success is also due to its use of the highest quality materials and processes

in making the Loewe Products.

58.    Additionally, Loewe owes a substantial amount of the success of the Loewe

Products to its consumers and word-of-mouth buzz that its consumers have generated.

59.    Loewe's efforts, the quality of Loewe's products and the word-of-mouth buzz

generated by its consumers have made the Loewe Marks and Loewe Products prominently placed

in the minds of the public. Members of the public and retailers have become familiar with the

Loewe Marks and Loewe Products and have come to associate them exclusively with Loewe.

Loewe has acquired a valuable reputation and goodwill among the public as a result of such

associations.

60.     Loewe has gone to great lengths to protect its interests in the Loewe Products and the Loewe Marks. No one other than Loewe and its authorized licensees and distributors are authorized to manufacture, import, export, advertise, offer for sale or sell any goods utilizing the Loewe Marks, or otherwise use the Loewe Marks, without the express permission of Loewe.

61.     Defendant is advertising, listing, promoting, purchasing, validating, reviewing, warehousing, packaging, shipping and/or otherwise facilitating the sale of Counterfeit Products through the CSSBuy e-commerce platform.

62.     Defendant is not, nor has it ever been, an authorized distributor or licensee of the Celine, Dior, Fendi and Loewe Products. Plaintiffs, nor any of Plaintiffs' authorized agents, have consented to Defendant's use of any of Plaintiffs' Marks, nor have Plaintiffs consented to Defendant's use of marks that are confusingly similar to, identical to and constitute a counterfeiting or infringement of Plaintiffs' Marks.

63.     Plaintiffs are likely to prevail on their Lanham Act and related common law claims at trial.

64.     As a result of Defendant's counterfeiting activities, Plaintiffs, as well as consumers, are likely to suffer immediate and irreparable losses, damages and injuries before Defendant can be heard in opposition, unless Plaintiffs' Application for *ex parte* relief is granted:

    a.     Defendant has advertised, listed, promoted, purchased, validated, reviewed, warehoused, packaged, shipped, exported and/or otherwise facilitated the sale of Counterfeit Products that infringe Plaintiffs' Marks;

    b.     Plaintiffs have well-founded fears that more Counterfeit Products will appear in the marketplace; that consumers may be misled, confused and disappointed by the quality

20

of these Counterfeit Products, resulting in injury to Plaintiffs' reputations and goodwill; and that Plaintiffs may suffer loss of sales for the Celine, Dior, Fendi and Loewe Products; and

c. Plaintiffs have well-founded fears that if they proceed on notice to Defendant on this Application, Defendant will: (i) secret, conceal, destroy, alter, sell-off, transfer or otherwise dispose of Counterfeit Products or other goods that infringe Plaintiffs' Marks, the means of obtaining or manufacturing such Counterfeit Products, and records relating thereto that are in its possession or under their control, (ii) inform its suppliers and others of Plaintiffs' claims with the result being that those suppliers and others may also secret, conceal, sell-off or otherwise dispose of Counterfeit Products or other goods infringing Plaintiffs' Marks, the means of obtaining or manufacturing such Counterfeit Products, and records relating thereto that are in their possession or under their control, (iii) and/or secret, conceal, transfer or otherwise dispose of its ill-gotten proceeds from its sales and/or facilitation of sales of Counterfeit Products or other goods infringing Plaintiffs' Marks and records relating thereto that are in their possession or under its control.

65.    The balance of potential harm to Defendant of being prevented from continuing to profit from its illegal and infringing activities if a temporary restraining order is issued is far outweighed by the potential harm to Plaintiffs, their businesses, the goodwill built up in and associated with the Plaintiffs' Marks and to their reputations if a temporary restraining order is not issued.

66.    The public interest favors the issuance of a temporary restraining order in order to protect Plaintiffs' interests in and to Plaintiffs' Marks, and to protect the public from being

deceived and defrauded by Defendant's passing off of its substandard Counterfeit Products as Celine, Dior, Fendi and Loewe Products.

67.    Plaintiffs have not publicized their request for a temporary restraining order in any way.

68.    Service on Defendant via Federal Express is reasonably calculated to result in proper notice to Defendant.

69.    If Defendant is given notice of the Application, it is likely to secret, conceal, transfer or otherwise dispose of its ill-gotten proceeds from its sales and/or facilitating sales of Counterfeit Products or other goods infringing Plaintiffs' Marks. Therefore, good cause exists for granting Plaintiffs' request for an asset restraining order.

70.    It typically takes the Financial Institutions a minimum of five (5) days after service of the Order to locate, attach and freeze Defendant's Assets and/or Defendant's Financial Accounts. As such, the Court allows enough time for Plaintiffs to serve the Financial Institutions with this Order, and for the Financial Institutions to comply with Paragraph I(B)(1) of this Order, respectively, before requiring service on Defendant.

71.    Similarly, if Defendant is given notice of the Application, it is likely to destroy, move, hide or otherwise make inaccessible to Plaintiffs the records and documents relating to Defendant's advertising, listing, promoting, purchasing, validating, reviewing, warehousing, packaging, and shipping sales of Counterfeit Products.  Therefore, Plaintiffs have good cause to be granted expedited discovery.

<u>**ORDER**</u>

Based on the foregoing findings of fact and conclusions of law, Plaintiffs' Application is hereby **GRANTED** as follows:

## I.    <u>Temporary Restraining Order</u>

A.  IT IS HEREBY ORDERED, as sufficient cause has been shown, that Defendant is hereby restrained and enjoined from engaging in any of the following acts or omissions for fourteen (14) days from the date of this order, and for such further period as may be provided by order of the Court:

    1)    advertising, listing, promoting, purchasing, validating, reviewing, warehousing, packaging, shipping and/or otherwise facilitating the sale of Counterfeit Products, or any other products bearing Plaintiffs' Marks and/or marks that are confusingly similar to, identical to and constitute a counterfeiting or infringement of Plaintiffs' Marks;

    2)    directly or indirectly infringing in any manner Plaintiffs' Marks;

    3)    using any reproduction, counterfeit, copy or colorable imitation of Plaintiffs' Marks to identify any goods or service not authorized by Plaintiffs;

    4)    using Plaintiffs' Marks and/or any other marks that are confusingly similar to Plaintiffs' Marks on or in connection with advertising, listing, promoting, purchasing, validating, reviewing, warehousing, packaging, shipping, exporting and/or otherwise facilitating the sale of Counterfeit Products;

    5)    using any false designation of origin or false description, or engaging in any action which is likely to cause confusion, cause mistake and/or to deceive members of the trade and/or the public as to the affiliation, connection or association of any product advertised, listed, promoted, purchased, validated, reviewed, warehoused, packaged, shipped, exported and/or otherwise sold by Defendant with Plaintiffs, and/or as to the origin, sponsorship or approval of any product manufactured, imported, exported,

advertised, marketed, promoted, distributed, displayed, offered for sale or sold by Defendant and Defendant's commercial activities and Plaintiffs;

6)      secreting, concealing, destroying, altering, selling off, transferring or otherwise disposing of and/or dealing with: (i) Counterfeit Products and/or (ii) any computer files, data, business records, documents or any other records or evidence relating to Defendant's Assets and the advertising, listing, promoting, purchasing, validating, reviewing, warehousing, packaging, shipping, exporting and/or otherwise facilitating the sale of Counterfeit Products;

7)      knowingly instructing any other person or business entity to engage in any of the activities referred to in subparagraphs I(A)(1) through I(A)(6) above and I(B)(1) below.

B.  IT IS HEREBY ORDERED, as sufficient cause has been shown, that Defendant and all persons in active concert and participation with them who receive actual notice of this Order, including the Financial Institutions who satisfy those requirements and are identified in this Order are hereby restrained and enjoined from engaging in any of the following acts or omissions for fourteen (14) days from the date of this order, and for such further period as may be provided by order of this Court:

1)      secreting, concealing, transferring, disposing of, withdrawing, encumbering or paying Defendant's Assets from or to Defendant's Financial Accounts until further ordered by this Court.

## II.    <u>Order to Show Cause Why A Preliminary Injunction Should Not Issue And Order Of Notice</u>

A.  Defendant is hereby ORDERED to show cause before this Court on July 26, 2024, 2024 at 12:00 p.m. by dialing 1-888-363-4749 (access code: 3768660), why a preliminary injunction, pursuant to Fed. R. Civ. P. 65(a), should not issue.

B. IT IS FURTHER ORDERED that opposing papers, if any, shall be filed electronically with the Court and served on Plaintiffs' counsel by delivering copies thereof to the office of Epstein Drangel LLP at 60 East 42nd Street, Suite 1250, New York, NY 10165, Attn: Jason M. Drangel on or before July 17, 2024. Plaintiffs shall file any Reply papers on or before July 23, 2024.

C. IT IS FURTHER ORDERED that Defendant is hereby given notice that failure to appear at the show cause hearing scheduled in **Paragraph II(A)** above may result in the imposition of a preliminary injunction against it pursuant to Fed. R. Civ. P. 65, which may take effect immediately upon the expiration of this Order, and may extend throughout the length of the litigation under the same terms and conditions set forth in this Order.

### III.    <u>Asset Restraining Order</u>

A. IT IS FURTHER ORDERED pursuant to Fed. R. Civ. P. 64 and 65 and N.Y. C.P.L.R. 6201 and this Court's inherent equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief, as sufficient cause has been shown, that within five (5) days of receipt of service of this Order, the Financial Institutions shall locate and attach Defendant's Financial Accounts and shall provide written confirmation of such attachment to Plaintiffs' counsel.

## IV.    Order Authorizing Bifurcated and Alternative Service by Federal Express

A.  IT IS FURTHER ORDERED pursuant to Fed. R. Civ. P. 4(f)(3), as sufficient cause has been shown, that service may be made on, and shall be deemed effective as to Defendant if it is completed via Federal Express at Defendant's registered office address, 300 Lockhart Road, 12/F, Wan Chai, Hong Kong CN 99907.

B.  IT IS FURTHER ORDERED, as sufficient cause has been shown, that such alternative service ordered herein shall be deemed effective as to Defendant and Financial Institutions through the pendency of this action.

C.  IT IS FURTHER ORDERED, as sufficient cause has been shown, that such alternative service ordered herein shall be made within five (5) days of the Financial Institutions compliance with **Paragraphs III(A)** and **V(C)** of this Order.

D.  IT IS FURTHER ORDERED, as sufficient cause has been shown, that service may be made and shall be deemed effective as to the following if it is completed by the below means:

   1)    delivery of: (i) a PDF copy of this Order, or (ii) a link to a secure website where PayPal Inc. will be able to download a PDF copy of this Order via electronic mail to PayPal Legal Specialist at EEOMALegalSpecialist@paypal.com;

   2)    delivery of: (i) a PDF copy of this Order, or (iii) a link to a secure website where AliPay.com Co., Ltd., Ant Financial Services, World First Asia, Ltd., AUS Merchant Services, Inc. and Alipay Merchant Services Pte. Ltd. will be able to download a PDF copy of this Order via electronic mail to US_IPR_TRO_Requests@alipay.com;

   3)    delivery of (i) a PDF copy of this Order, or (ii) a link to a secure website where Stripe Payments Canada, Ltd. will be able to download a PDF copy of this Order via electronic mail to notices@stripe.com;

4)      delivery of (i) a PDF copy of this Order, or (ii) a link to a secure website where Visa Inc. will be able to download a PDF copy of this Order via electronic mail to businessconduct@visa.com;

5)      delivery of (i) a PDF copy of this Order, or (ii) a link to a secure website where American Express Company will be able to download a PDF copy of this Order via electronic mail to amexsru@aexp.com;

6)      delivery of (i) a PDF copy of this Order, or (ii) a link to a secure website where Mastercard Inc. will be able to download a PDF copy of this Order via electronic mail to ipinquiries@mastercard.com;

7)      delivery of (i) a PDF copy of this Order, or (ii) a link to a secure website where Discover Financial Services, Inc. will be able to download a PDF copy of this Order via electronic mail to civilsubpoena@discover.com;

8)      delivery of (i) a PDF copy of this Order, or (ii) a link to a secure website where Apple Inc. will be able to download a PDF copy of this Order via electronic mail to lawenforcement@apple.com;

9)      delivery of (i) a PDF copy of this Order, or (ii) a link to a secure website where Google LLC will be able to download a PDF copy of this Order via electronic mail to google-legal-support@google.com;

10)     delivery of: (i) a PDF copy of this Order, or (ii) a link to a secure website where JPMorgan Chase Bank, NA will be able to download a PDF copy of this Order via electronic mail to kristina.r.hall@jpmchase.com;

11)     delivery of: (i) a PDF copy of this Order, or (ii) a link to a secure website where Payoneer Inc. will be able to download a PDF copy of this Order via electronic mail to thirdpartyrequests@payoneer.com;

12)     delivery of: (i) a PDF copy of this Order, or (ii) a link to a secure website where PingPong Global Solutions Inc. will be able to download a PDF copy of this Order via electronic mail to legal-int@pingpongx.com;

13)     delivery of: (i) a PDF copy of this Order, or (ii) a link to a secure website where Airwallex (Hong Kong) Limited and Airwallex (UK) Limited will be able to download a PDF copy of this Order via electronic mail to kking@maglaw.com;

14)     delivery of: (i) a PDF copy of this Order, or (ii) a link to a secure website where Worldpay (HK) Limited will be able to download a PDF copy of this Order via electronic mail to support@worldpay.com;

15)     delivery of: (i) a PDF copy of this Order, or (ii) a link to a secure website where World First UK Ltd. will be able to download a PDF copy of this Order via electronic mail to complaints@worldfirst.com;

16)     delivery of: (i) a PDF copy of this Order, or (ii) a link to a secure website where Bank of China will be able to download a PDF copy of this Order via electronic mail to service.at@bankofchina.com;

17)     delivery of: (i) a PDF copy of this Order, or (ii) a link to a secure website where Citibank N.A. will be able to download a PDF copy of this Order via electronic mail to alyssa.mitchell@citi.com, renae.a.rodriguez@citi.com and lsi@citi.com;

18)     delivery of: (i) a PDF copy of this Order, or (ii) a link to a secure website where GreenDot Bank will be able to download a PDF copy of this Order via electronic mail to IR@greendot.com;

19)     delivery of: (i) a PDF copy of this Order, or (ii) a link to a secure website where iDEAL, a payment services product provided by Stripe Payments Canada, Ltd., will be able to download a PDF copy of this Order via electronic mail to notices@stripe.com;

20)     delivery of: (i) a PDF copy of this Order, or (ii) a link to a secure website where Wise Payments Limited will be able to download a PDF copy of this Order via electronic mail to thirdpartyrequests@wise.com;

21)     delivery of: (i) a PDF copy of this Order, or (ii) a link to a secure website where WeChat Pay will be able to download a PDF copy of this Order via electronic mail to wxpayglobal@tencent.com;

22)     delivery of: (i) a PDF copy of this Order, or (ii) a link to a secure website where Community Federal Savings Bank will be able to download a PDF copy of this Order via electronic mail to compliance@cfsb.com; and

23)     delivery of: (i) a PDF copy of this Order, or (ii) a link to a secure website where First Century Bank NA will be able to download a PDF copy of this Order via electronic mail to info@myfcbusa.com.

### V.    Order Authorizing Expedited Discovery

A.  IT IS FURTHER ORDERED, as sufficient cause has been shown, that:

1)     Within fourteen (14) days after receiving service of this Order, Defendant shall serve upon Plaintiffs' counsel a written report under oath providing:

   a.   its  true name and physical address;

     b.   the name and location and URL of any and all websites that Defendant owns and/or operates.

     c.   the complete sales records for any and all sales of Counterfeit Products, including but not limited to number of units sold, the price per unit, total gross revenues received (in U.S. dollars) and the dates thereof;

     d.   the account details for any and all of Defendant's Financial Accounts, including, but not limited to, the account numbers and current account balances; and

     e.   the steps taken by Defendant, or other person served to comply with **Section I**, above.

2)   Plaintiffs may serve interrogatories pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure as well as Local Civil Rule 33.3 of the Local Rules for the Southern and Eastern Districts of New York and Defendant who is served with this Order shall provide written responses under oath to such interrogatories within fourteen (14) days of service to Plaintiffs' counsel.

3)   Plaintiffs may serve requests for the production of documents pursuant to Fed. R. Civ. P. 26 and 34, and Defendant who is served with this Order and the requests for the production of documents shall produce all documents responsive to such requests within fourteen (14) days of service to Plaintiffs' counsel.

B.  IT IS FURTHER ORDERED, as sufficient cause has been shown, that within five (5) days of receipt of service of this Order the Financial Institutions served with this Order shall identify any and all of Defendant's Financial Accounts, and provide Plaintiffs' counsel with a summary report containing account details for any and all such accounts, which shall include, at a minimum, identifying information for Defendant, including contact information for Defendant

(including, but not limited to, mailing addresses and e-mail addresses), account numbers and account balances for any and all of Defendant's Financial Accounts and confirmation of said compliance with this Order.

C. IT IS FURTHER ORDERED, as sufficient cause has been shown, that:

1) Within fourteen (14) days of receiving actual notice of this Order, all Financial Institutions who are served with this Order shall provide Plaintiffs' counsel all documents and records in their possession, custody or control (whether located in the U.S. or abroad) relating to any and all of Defendant's Financial Accounts, including, but not limited to, documents and records relating to:

a. account numbers;

b. current account balances;

c. any and all account opening documents and records, including, but not limited to, account applications, signature cards, identification documents and if a business entity, any and all business documents provided for the opening of each and every of Defendant's Financial Accounts;

d. any and all deposits and withdrawals during the previous year from each and every one of Defendant's Financial Accounts and any and all supporting documentation, including, but not limited to, deposit slips, withdrawal slips, cancelled checks and account statements; and

e. any and all wire transfers into each and every one of Defendant's Financial Accounts during the previous year, including, but not limited to, documents sufficient to show the identity of the destination of the transferred funds, the identity of the beneficiary's bank and the beneficiary's account number.

31

**VI.**     **Security Bond**

A. IT IS FURTHER ORDERED that Plaintiffs shall place security in the amount of five hundred thousand Dollars ($500,000) with the Court which amount is determined adequate for the payment of any damages any person may be entitled to recover as a result of an improper or wrongful restraint ordered hereunder.

**VII.**     **Sealing Order**

A. IT IS FURTHER ORDERED that Plaintiffs' Complaint and exhibits attached thereto, and Plaintiffs' *ex parte* Application and the Declarations of Nicolas Lambert and Grace A. Rawlins in support thereof and exhibits attached thereto, and this Order shall remain sealed until the Financial Institutions and Third Party Service Providers comply with **Paragraphs I(B), III(A) and V(C)** of this Order.

**SO ORDERED.**

SIGNED this ___15th___ day of ___July_____, 2024.

_____
HON. ANDREW L. CARTER
UNITED STATES DISTRICT JUDGE